UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


COREY HOLCOMB,

                  Plaintiff,                                      Hon. Richard Alan Enslen

v.                                            Case No. 1:07-CV-680

COMMISSIONER OF SOCIAL
SECURITY,

                  Defendant.
_____/


## REPORT AND RECOMMENDATION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Section 405(g)

limits the Court to a review of the administrative record, and provides that if the Commissioner's

decision is supported by substantial evidence, it shall be conclusive.

        Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges

to submit proposed findings of fact and recommendations for disposition of social security appeals,

the undersigned recommends that the Commissioner's decision be **reversed and this matter**

**remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 30 years of age at the time of the ALJ's decision. (Tr. 26). He attended college for one year and worked previously as an assembler, mail handler, and laborer. (Tr. 26, 92, 114, 119, 132-38).

Plaintiff applied for benefits on August 8, 2000, alleging that he had been disabled since July 17, 1996, due to depression and a head injury. (Tr. 73-75, 113). Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 34-69). On December 1, 2004, Plaintiff appeared before ALJ B. Lloyd Blair, with testimony being offered by Plaintiff and vocational expert, Donald Hecker. (Tr. 1011-39). In a written decision dated July 29, 2005, the ALJ determined that Plaintiff was not disabled. (Tr. 26-33). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 7-12). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on June 30, 1998. (Tr. 27); *see also*, 42 U.S.C. § 423(c)(1). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that he became disabled prior to the expiration of his insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## RELEVANT MEDICAL HISTORY

On July 17, 1996, Plaintiff was involved in an automobile accident in which he suffered "very severe" injuries.  (Tr. 145).  A CT scan of Plaintiff's head revealed:

> cranial facial fractures with intracranial pneumocephalus and hemorrhage within the brain parenchyma extra-axial spaces and possible subependymal region of the ventricle.    Intracranial hypertension is present.  There is opacity of the right maxillary sinus, consistent with multiple fractures.

(Tr. 214-15).

Plaintiff was placed in a drug-induced coma "to try to control elevated intercranial pressure."  (Tr. 219-23).  A CT scan of Plaintiff's face revealed "extensive facial fractures involving the right maxillary sinus, nose, frontal sinuses, and both orbits."  (Tr. 211-13).  Plaintiff suffered a "complete transverse fracture of the left proximal femoral shaft" and a "transverse fracture of the medial malleolus" of the right ankle.  (Tr. 206-09).  A CT scan of Plaintiff's thorax revealed "evidence of aortic tear, with mediastinal hematoma."  (Tr. 218).  Plaintiff also suffered a ruptured spleen.  (Tr. 260).

Plaintiff underwent "emergency" surgery to repair the injury to his aorta.  (Tr. 154-55).  Plaintiff's spleen was removed.  (Tr. 153).  Plaintiff underwent surgery to repair the several facial fractures he suffered.  (Tr. 158-59).  He underwent "closed reduction and intermedullary fixation of [the] left femur and closed reduction with percutaneous pinning of [the] right medial malleolus."  (Tr. 156-57).  Doctors installed in Plaintiff's skull a "Camino ventricular ICP catheter" to monitor intercranial pressure and facilitate drainage of cerebrospinal fluid.  (Tr. 143, 152).  Plaintiff also had a gastric feeding tube installed.  (Tr. 160-62).

4

Plaintiff was on a ventilator for "approximately two weeks," after which time he "rapidly improved." (Tr. 144). On August 8, 1996, Plaintiff was discharged from Butterworth Hospital to Sparrow Hospital to participate in "inpatient rehabilitation." (Tr. 143-44). Plaintiff responded well to therapy and was discharged home on August 27, 1996. (Tr. 280-83). The following day, Plaintiff began participating in physical therapy at Greater Lansing Rehabilitation Agency. (Tr. 344-46).

On October 24, 1996, Plaintiff was examined by Dr. John Putz. (Tr. 350). X-rays of Plaintiff's right ankle and left femur revealed that both injuries were healing well. (Tr. 350). Plaintiff exhibited a "bit of a limp" which the doctor attributed to "his head injury and some general weakness." (Tr. 350).

Plaintiff was discharged from physical therapy on November 21, 1996, by which time he had attended 34 therapy sessions. (Tr. 326-41). Upon discharge, Plaintiff's condition was described as "improved." (Tr. 326).

On January 20, 1997, Plaintiff was examined by Dr. Putz. (Tr. 349). Plaintiff reported that he was doing "fine" with some occasional soreness in his thigh. (Tr. 349). X-rays of Plaintiff's left femur revealed "almost 100% healing of the fracture with quite a bit of callus present and some calcification into the anterior muscle." (Tr. 349). The doctor told Plaintiff that he could "increase his activity as tolerated." (Tr. 349).

On May 8, 1997, Plaintiff underwent surgery to remove a tumor from his small bowel. (Tr. 314). Plaintiff was discharged home on May 14, 1997, with instructions to perform "activity as tolerated, no heavy lifting." (Tr. 311).

5

On September 8, 1997, Plaintiff participated in a consultive examination conducted by Dr. George Fuksa.  (Tr. 353-56).  Plaintiff reported that prior to his automobile accident he was "an assembly worker ar American Bumper Manufacturing [where he] mostly racked 25 to 65 pound bumpers all night."  (Tr. 354).  Plaintiff reported that he was experiencing "almost constant" pain in his left hip and "soreness and aching" in his left leg and right ankle.  (Tr. 354).  Plaintiff described the intensity of his pain as ranging from "slight to occasionally severe."  (Tr. 355).  The doctor observed that Plaintiff's left leg was one-quarter inch shorter than the right and that Plaintiff was "limping to the left."  (Tr. 355).  X-rays of Plaintiff's left femur revealed "a healed comminuted fracture of the left femur with intramedullary rod in and anti-rotation screws in, well healed."  (Tr. 356).  X-rays of Plaintiff's right ankle revealed "a healed fracture of the medial malleolus in excellent anatomical position with two screws in."  (Tr. 356).  Dr. Fuksa concluded that Plaintiff "can return back to his original work without restrictions."  (Tr. 356).

On September 23, 1997, Plaintiff was examined by Dr. Linda Angell.  (Tr. 347).  The doctor reported that since the automobile accident, Plaintiff has been experiencing double vision.  (Tr. 347).  Dr. Angell concluded that Plaintiff was "a candidate for eye muscle surgery" because "spontaneous resolution probably will not occur."  (Tr. 347).

On October 3, 1997, Plaintiff was examined by Dr. John Putz.  (Tr. 349).  Plaintiff reported that he was experiencing pain in his left hip.  (Tr. 349).  The results of a physical examination were unremarkable.  (Tr. 349).  Plaintiff indicated that he "thinks he would like to have the rod removed" from his left leg.  (Tr. 349).  Dr. Putz indicated that he "cannot guarantee [Plaintiff] that this will relieve his symptoms."  (Tr. 349).  Nonetheless, the doctor removed the rod from Plaintiff's leg, after which Plaintiff was instructed that he could "weight bear as tolerated."  (Tr.

6

348).  Dr. Putz reported that Plaintiff "does not have any particular restrictions on him other than the discomfort level."  (Tr. 348).

On March 1, 1998, Plaintiff reported to the emergency room after suffering a "partial" seizure.  (Tr. 358).  While he was being examined in the emergency room, Plaintiff suffered a grand mal seizure.  (Tr. 358).  Plaintiff was then admitted to Sparrow Hospital, where he was subsequently diagnosed with "acute meningitis with seizure disorder most likely status post head trauma."  (Tr. 358-61).  Doctors were unable to determine whether Plaintiff's seizures "were solely related to" his meningitis or his head injury because Plaintiff "experienced several seizures shortly after admission following the motor vehicle accident."  (Tr. 370, 373).  Plaintiff experienced no further seizures while in the hospital and was discharged on March 10, 1998, with instructions to take Dilantin for his seizures.  (Tr. 358-59).

The results of a June 30, 1998 EEG examination were again "abnormal."  (Tr. 473). Plaintiff was instructed to continue taking Dilantin.  (Tr. 473).

On July 7, 1998, Plaintiff participated in a neuropsychological evaluation conducted by Robert Fabiano, Ph.D.  (Tr. 379-84).  Plaintiff participated in the Wechsler Adult Intelligence Scale-Revised, the results of which revealed that he possesses a verbal IQ of 109, a performance IQ of 104, and a full-scale IQ of 107, which "approaches the high average range for intellectual functioning."  (Tr. 379-80).  Plaintiff also participated in a "verbal memory" evaluation, the results of which indicated that Plaintiff performed "withing the high average range."  (Tr. 381).  Plaintiff performed "within normal limits" on motor speed and dexterity tests and in the "high average range" on visual organization and integration testing.  (Tr. 381).

Plaintiff performed within "normal" limits on a variety of "executive functions" evaluations, except for the psychomotor speed evaluation on which Plaintiff scored in the "low average range. . .representing a mild degree of impairment." (Tr. 382). With respect to Plaintiff's psychosocial functioning, Dr. Fabiano reported the following:

> The patient completed the CATI, a standardized personality inventory that assesses a vast array of psychological disorders including depression, anxiety, and personality disturbance. The CATI also provides a number of scales which assess self-report of memory and cognitive impairment. On the CATI, the patient provided a valid profile. He demonstrated a prominent pattern suggestive of individuals who have experienced intense and unstable interpersonal relationships, become easily discouraged, and demonstrate considerable difficulty modulating their temper. These individuals are often observed by others to be somewhat impulsive. They demonstrate a tendency to engage in behavior which is self-defeating and demonstrate limited insight into the role in which their behavior contributes to their difficulties. This pattern is often observed with individuals who have long standing and chronic problems with relationships, often experience a significant degree of social isolation, are easily depressed, and demonstrate reduced frustration tolerance. Further assessment of mood on the BDI resulted in a composite score of 21 which would place the patient within the moderate range for endorsement of depressive symptoms. The patient endorsed mild to moderate levels of dysphoria, feelings of discouragement, anhedonia, irritability, reduced initiation, and fatigue. The patient also reported long standing problems with insomnia which he reports have been further complicated since his traumatic brain injury. Information obtained within the clinical interview and through direct behavioral observations would indicate that from a neurocognitive perspective, this individual has made an extremely remarkable recovery from a severe traumatic brain injury. However, he has demonstrated a number of psychological problems prior to his traumatic brain injury which continue to serve as obstacles in terms of his optimal psychosocial and vocational functioning. A number of structured interventions will be recommended to improve his level of adaptive functioning.

(Tr. 382).

The doctor diagnosed Plaintiff with dysthymic disorder and personality disorder with antisocial and borderline traits.  (Tr. 384).  Plaintiff's GAF score was rated as 60.[1]  (Tr. 384).

On July 12, 1998, Plaintiff completed a report concerning his activities.  (Tr. 108-11).  Plaintiff reported that he rarely prepares meals.  (Tr. 108).  As for his ability to perform other household tasks (e.g., laundry, vacuuming, dusting, mopping, and washing dishes), Plaintiff reported that he "can do most of these things," but that doing so "takes all [his] energy."  (Tr. 109).  Plaintiff reported that, due to his seizures, he is still unable to drive.  (Tr. 109).

On July 16, 1998, Plaintiff was transported to the emergency room.  (Tr. 402).  Plaintiff's wife reported that Plaintiff had been suffered a headache for "approximately 5 days."  (Tr. 402).  She further reported that Plaintiff "has been mumbling and making unintelligible statements and this is completely out of character for him and he appears to be saying inappropriate things."  (Tr. 402).  When questioned by hospital personnel, Plaintiff did not know what day it was or where he was located.  (Tr. 402).

Plaintiff participated in an EEG examination, the results of which were "abnormal" with "evidence of generalized cerebral disturbance in addition to the presence of paroxysms of slow waves in a generalized fashion with a gradient to the right especially in the right anterior quadrant and in the biposterior region."  (Tr. 415).  Doctors concluded that Plaintiff might be suffering from meningitis, but also indicated that the presence of a "persistent cerebrospinal fluid leak" was also a possibility given the facial fractures which Plaintiff suffered.  (Tr. 411, 415).

---

[1]  The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV).  A GAF score of 60 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning."  DSM-IV at 34.

Plaintiff was admitted to the hospital, after which he was diagnosed with bacterial meningitis. (Tr. 400). Doctors also discovered, however, the presence of "a [cerebrospinal fluid] fistula between the anterior fossa and the ethmoid sinus," for which Plaintiff underwent a left frontal craniotomy. (Tr. 400, 444-45). Plaintiff's headaches "slowly decreased in intensity" and he was discharged home on August 3, 1998. (Tr. 399-401).

On August 17, 1998, Plaintiff began participating in psychotherapy with Karen Gallagher. (Tr. 644). Psychotherapy treatment notes dated August 31, 1998, reveal that Plaintiff's "presentation is one of general sluggishness." (Tr. 643). On September 15, 1998, Plaintiff reported to Gallagher that he gets "fatigued." (Tr. 641).

A September 1, 1998 examination revealed "no major neurological deficits" and Plaintiff was instructed to continue taking Dilantin as prescribed. (Tr. 471).

In a report dated October 5, 1998, Karen Gallagher reported that Plaintiff is "extremely passive" and "presents with quite a depressed affect." (Tr. 635). Gallagher diagnosed Plaintiff with dysthymic disorder and personality disorder with antisocial and borderline traits. (Tr. 636). She noted that Plaintiff "also struggles with significant deficits associated with [his traumatic brain injury]." (Tr. 635).

Treatment notes dated October 19, 1998, reveal that Plaintiff was 35 minutes late for his therapy session with Ms. Gallagher. (Tr. 632). Plaintiff reported that he "procrastinates." (Tr. 632). Plaintiff's November 23, 1998 therapy session was cancelled because he was unable to arrive on time. (Tr. 627). On November 30, 1998, Plaintiff reported that he continues to experience a "lack of motivation." (Tr. 626). Plaintiff failed to attend three separate therapy sessions scheduled

in December 1998.  (Tr. 623-24).  Plaintiff was unable to attend his January 4, 1999 therapy session because he was "running behind" and was unable to arrive on time.  (Tr. 621).

On January 14, 1999, Plaintiff reported that he was no longer experiencing seizures. (Tr. 470).  He was instructed to continue taking Dilantin as prescribed.  (Tr. 470).

Plaintiff cancelled his January 25, 1999 therapy session because he "didn't get up in time."  (Tr. 615).  Plaintiff was scheduled to meet with Karen Gallagher on February 1, 1999, but he "did not show or call."  (Tr. 614).  On February 8, 1999, Plaintiff telephoned Ms. Gallagher to inform her that he was unable to arrive on time for appointments scheduled at 1:00 p.m. and need his appointments rescheduled to 2:00 p.m.  (Tr. 613).

On February 9, 1999, Plaintiff reported to the emergency room complaining of "fever and headache."  (Tr. 456).  The results of a physical examination were largely unremarkable, after which Plaintiff underwent a lumbar puncture procedure, the results of which indicated that Plaintiff was suffering from an "acute viral syndrome."  (Tr. 456-57).  Plaintiff was provided medication and discharged home.  (Tr. 457).

Plaintiff arrived 30 minutes late for his March 17, 1999 therapy session.  (Tr. 609). He arrived 20 minutes late for his March 24, 1999 therapy session.  (Tr. 608).  Plaintiff simply failed to attend his April 28, 1999 therapy session.  (Tr. 607).  On April 29, 1999, Ms. Gallagher authored a letter in which she reported that "[i]ndividuals who suffer from brain injury may also struggle with cognitive changes, including decreased capacity to use judgment appropriately, social, emotional, and behavioral changes as well as deficits in memory and perception, concentration or attention." (Tr. 606).  Gallagher reported that Plaintiff "struggles currently with these issues."  (Tr. 606).

11

Treatment notes dated July 14, 1999, reveal that Plaintiff was no longer suffering seizures, but that he "feels very tired and fatigued all of the time."  (Tr. 468).

On February 4, 2002, Plaintiff participated in an evaluation conducted by Dr. Fabiano. (Tr. 586-91).  According to the doctor, "the results of neuropsychological evaluation do find a pattern of performance deficits most notable in areas of sustained attention with features of distractibility and impulsivity."  (Tr. 590).  Plaintiff was diagnosed with (1) attention deficit hyperactivity disorder, combined type possibly secondary to traumatic brain injury, and (2) dysthymic disorder.  (Tr. 591).

On June 5, 2003, Plaintiff began in-patient treatment with the MSU - Origami Brain Injury Rehabilitation Facility.  (Tr. 665).  On June 9, 2003, Plaintiff participated in cognitive testing, the results of which revealed (among other things) that Plaintiff's "executive functioning is characterized by difficulties with planning, organization, and time management."  (Tr. 671).  The examiner noted that Plaintiff arrived 30 minutes late for this particular examination.  (Tr. 671).  On June 25, 2003, Dr. Larry Prokop, reported that Plaintiff "struggles with time management and prioritization." (Tr. 676).  Dr. Prokop further reported that Plaintiff "is consistently 30 minutes late to all sessions."  (Tr. 676).

Treatment notes dated August 6, 2003, reveal that Plaintiff "has adjusted well to his residency at Origami" and "has responded well to the structure provided by the Origami environment and has begun to demonstrate some increased initiation."  (Tr. 683).  Treatment notes dated October 29, 2003, reveal that Plaintiff was responding well to treatment, but that Plaintiff experiences "difficulty paying attention. . .when distractions are present."  (Tr. 693).  It was also noted that

12

Plaintiff recently "obtained a part-time temporary paid position with the Humane Society" doing "data entry work." (Tr. 694).

On December 15, 2003, Plaintiff began residing at a Residence Inn as part of Origami's plan to help prepare Plaintiff "for independent living." (Tr. 697, 699).

Treatment notes dated February 25, 2004, reveal that Plaintiff "continues to have difficulty reporting to work and therapy sessions on time." (Tr. 702). It was noted that Plaintiff "demonstrated 50% attendance record for therapy sessions and when he did attend, he arrived [more than] 15 minutes late." (Tr. 702).

On July 2, 2004, Brett Van Tol, Ph.D. participated in a deposition arranged by Plaintiff. (Tr. 504-33). Dr. Van Tol is a rehabilitation psychologist, specializing in neurological and traumatic brain injuries. (Tr. 508). Dr. Van Tol was part of the team that treated Plaintiff at Origami. (Tr. 508). The doctor testified that Plaintiff was treated on an inpatient basis because "we needed to teach him some compensatory strategies, so we needed to create an environment that would allow him to learn those, support his learning of those strategies so that they became more habit-like for him, and then gradually transition him back into his home environment, hopefully, with those strategies having been learned." (Tr. 509). As the doctor explained, Plaintiff's "home environment was not a consistent enough place, nor a supportive enough place, for him to learn the strategies." (Tr. 509). With respect to Plaintiff's condition, Dr. Van Tol testified that:

> [Plaintiff] presents with symptoms that are consistent with a term in traumatic brain injury called abulia, and that is really an injury of a couple of structures in the brain, the limbic system, which is the emotional part of the brain, the basal ganglia, which is a part of the brain in terms of waking the brain up or helping the brain to initiate, or then the frontal lobes or executive functioning part of the brain. Individuals with injuries in these areas often present with a difficult

13

> time initiating and a difficult time following through, such that they
> have an extreme difficulty doing consistently tasks of daily living.
> They can do them, it's just not a consistent - it's difficult for them to
> be consistent with those things.  They have a difficult time getting a
> job or holding down a job.  They have a difficult time following
> through with things that used to be of interest to them.  So it's a real
> emotional drive kind of difficulty.

(Tr. 510-11).

Dr. Van Tol testified that Plaintiff also suffered from a personality disorder which was present prior to Plaintiff's automobile accident.  (Tr. 511-12).  The doctor reported, however, that "the injuries from the traumatic brain injury further exacerbated the symptoms of the personality disorder."  (Tr. 512).  Dr. Van Tol reported that Plaintiff also suffered from dysthymia, a "chronic, longstanding" type of depression, that "is common in folks that also have this abulia, which is sort of - this abulia can be understood as sort of an adynamia, a lack of energy."  (Tr. 512).  The doctor further testified that:

> This is a situation where [Plaintiff] has the intelligence, he knows the
> skills, he knows how to do activities of daily living, but because of
> that abulia or that lack of emotional drive, he's not always consistent
> in following through with his activities of daily living.  So for
> example, getting up on time in the morning, consistently getting up
> at seven o'clock a.m., [Plaintiff] is not able to consistently have the
> self-discipline to make himself get up at seven o'clock every
> morning, and that then causes that increased distress and the
> depression and the feelings of guilt.

(Tr. 518).

With respect to Plaintiff's progress at Origami, Dr. Van Tol testified that Plaintiff "responded relatively well to the structure provided him by the inpatient treatment."  (Tr. 512).  The doctor testified that Plaintiff "shows a lot of variability as his environment changes."  (Tr. 513).  As the doctor described it, when Plaintiff's "environment is supportive, he does better," but "when his

14

environment is not supportive, he falls apart."  (Tr. 513).  The doctor reported that Plaintiff's

condition "improved" in the in-patient environment.  (Tr. 513).  However, as he further testified:

> We transitioned him into the community integration program and started to pull away some of the support.  He showed some return of the symptoms that he had struggled with all along.  So when we pulled away some of the support, he started missing appointments.  He started to have difficulty following through.  He wasn't cleaning his apartment like he had been cleaning his room at Origami.  And then, eventually, he - that program ended and he had to go live with a friend.  Now that he's living with a friend, he has been very deficient in making his appointments, and he has even stopped taking his medication.

(Tr. 513-14).

When asked how somebody as intelligent as Plaintiff could possibly be unable to

"hold down a job" on a regular basis, Dr. Van Tol responded:

> The analogy that I often use in cases like [Plaintiff's] is sort of the analogy of a race car.  [Plaintiff] has a high IQ, in fact, a superior IQ.  That's like a race car having an engine with a lot of horsepower.  What [Plaintiff] doesn't have is the sort of executive functioning, emotional control which is like a steering wheel in a race car, so he's got all this power but he can't drive it.  He can't use his intelligence to build upon success, because he's always spinning his wheels, so to speak.  He can't harness that horsepower in a functional way.

(Tr. 516-17).

With respect to Plaintiff's ability to consistently work on a full-time, the following

exchange occurred between Dr. Van Tol and Plaintiff's counsel:

> Q:    Okay.  Given that knowledge and your involvement with [Plaintiff], do you have an opinion as to whether he could do a very simple job, five days a week, seven, eight hours a day, that he could be counted on by an employer at the present time?

15

A:      At the present time, no.  He is working part-time at the present time, but with an employer who is extremely accomodating.  For example, [Plaintiff] has no set work hours.  He can come as he wishes.

Q:      That's the Humane Society, is it not?

A:      That's the Humane Society.  Also, [Plaintiff's] tasks at the Humane Society are tasks - he does work that he's interested in and that he's good at, it involves computers, so he has a fairly limited job description there.

Q:      A very limited scope and focus?

A:      Exactly.  So he can come when he wants to and he can work on some tasks that he enjoys and that he's good at and gets positive support for.  If he had a job description that included tasks that he might not be interested in, and if there were set work hours, [Plaintiff] would have extreme difficulty being able to successfully meet those expectations.

Q:      Okay.  Would he have problems, given the abulia, with meeting just a structured work environment with expectations that the individual show up five days a week certain hours?

A:      Yes, yes.

Q:      Couldn't do it right now?

A:      Right now, no.

Q:      I know that your goal, ultimately, is to hopefully be able to try to integrate [Plaintiff] to where he might be able to hold a job, is that correct?

A:      That's correct.

Q:      But right now, he's not even close.

> A:     He's not close, and I don't know that he will, I don't know that he possesses the capacity, because of the brain injury and the other sequelae, to independently do that.
>
> Q:     He may never be able to do that?
>
> A:     Exactly.  I think he will need environmental structure and environmental support.

(Tr. 523-24).

The following exchange between Dr. Van Tol and Plaintiff's counsel occurred shortly thereafter:

> Q:     Okay.  Right now, you don't believe that there is any job in the general economy that [Plaintiff] could do, given the closed head trauma and the depression, is that correct?
>
> A:     No job that [Plaintiff] could consistently do to the level where he would be successful at it, successful enough to achieve gainful employment.
>
> Q:     Okay.  So he can't do that right now?
>
> A:     Right, and when we say he can't do it, I think it's important to distinguish that, intellectually, he could do it, but from a functional standpoint, the ability to do a job to support himself or to even successfully stay in that job, no.
>
> Q:     And why is that?
>
> A:     Because of the emotional difficulty due to the abulia, because of the difficulty being consistent with his behaviors and following through with tasks.
>
> Q:     And those are all related to the brain injury that he suffered in that motor vehicle accident?
>
> A:     Correct.

(Tr. 526).

17

## ANALYSIS OF THE ALJ'S DECISION

### A.  Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[2]  If the Commissioner can make a dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

### B.  The ALJ's Decision

The ALJ determined that Plaintiff suffers from the following severe impairments: (1) status-post left femur and right ankle fractures; (2) status-post closed head injury; (3) dysthymic disorder; and (4) a personality disorder with antisocial and borderline traits.  (Tr. 28).  The ALJ concluded that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 28-29).  The ALJ determined that while Plaintiff was unable to

---

[2] 1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

perform his past relevant work there existed a significant number of jobs which he could perform despite his limitations. (Tr. 29-31). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Not Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that as of the date his insured status expired, Plaintiff retained the capacity to perform light[3] work subject to the following limitations: (1) he can only occasionally kneel, stoop, crouch, crawl, or climb ramps or stairs; (2) he cannot be exposed to moving machinery or perform work at unprotected heights; (3)

---

[3] Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday." 20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A., 1983).

he cannot climb ropes, ladders, or scaffolds; (4) he can perform only simple, unskilled work which does not involve concentration on detailed or precise tasks; (5) he cannot perform work that requires him to read, compute, or problem solve; (6) he cannot perform work that requires more than limited contact with supervisors or close proximity with co-workers; (7) he cannot perform work that requires more than routine tasks with minimal changes or adaptation; and (8) he must be permitted to be absent from work once per month.  (Tr. 29).  A vocational expert testified that there existed approximately 24,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding.  (Tr. 1035-37).  Accordingly, the ALJ determined that Plaintiff was not disabled because there existed a significant number of jobs he could perform despite his limitations.

### a.   The ALJ Completely Ignored Relevant Medical Evidence

In his decision denying Plaintiff's claim for benefits, the ALJ stated that "none of the doctors who have seen or examined the claimant have expressed the opinion that he is disabled or in anyway limited to a greater degree than that found by the undersigned."  (Tr. 31).  This is absolutely inaccurate.  As detailed above, Dr. Van Tol, a treating physician who treated Plaintiff for a significant length of time, concluded that Plaintiff is unable to perform even a "simple" job on a consistent basis as a result of the brain injuries he suffered in the automobile accident.  The ALJ simply chose, however, to ignore the evidence regarding Plaintiff's treatment at Origami, where Dr. Van Tol (and others) treated Plaintiff.  The ALJ's decision contains absolutely no mention of Plaintiff's treatment at Origami or his treatment with Dr. Van Tol.

The Court recognizes that Dr. Van Tol did not begin treating Plaintiff until well after the expiration of his insured status.  This fact, by itself, is of no consequence, as it is well accepted

20

that medical evidence concerning a claimant's condition after the expiration of his insured status can nonetheless be relevant to the determination of whether the claimant was disabled prior to the expiration of his insured status. *See, e.g., Begley v. Mathews,* 544 F.2d 1345, 1354 (6th Cir.1976) ("[m]edical evidence of a subsequent condition of health, reasonably proximate to a preceding time, may be used to establish the existence of the same condition at the preceding time"); *Anderson v. Commissioner of Social Security*, 440 F.Supp.2d 696, 699-700 (E.D. Mich. 2006) ("medical evidence that postdates the insured status date may be, and ought to be, considered, insofar as it bears on the claimant's condition prior to the expiration of insured status") (citing *Begley*, 544 F.2d at 1354). In fact, the ALJ, in support of his decision, relied on certain select portions of the record concerning Plaintiff's condition subsequent to the expiration of his insured status.

The Court also recognizes that it is the ALJ that is authorized to weigh the evidence of record and resolve the conflicts therein and that the resolution of such conflicts must be upheld when supported by substantial evidence. *See, e.g., Workman v. Commissioner of Social Security*, 2004 WL 1745782 at *6 (6th Cir., July 29, 2004). Had the ALJ actually considered Dr. Van Tol's opinion and articulated a reason for discounting such, the Court might have reached a different conclusion. However, the ALJ simply ignored substantial and persuasive medical evidence that completely undercuts his reasoning and conclusion.

The Court is not suggesting that reversal is appropriate whenever the ALJ fails to address each and every item of evidence in the record. Almost every administrative record which an ALJ has to consider contains items of evidence which are so irrelevant or lacking in support that it hardly constitutes error for the ALJ to not specifically discuss such in his decisions. The present circumstance, however, is much different. Here, the ALJ completely ignored relevant and persuasive

21

medical evidence that, if given sufficient weight, completely undermines the rationale of his decision and would result in the conclusion that Plaintiff was disabled prior to the expiration of his insured status.

The Court takes no position on whether Dr. Van Tol's opinion (or the evidence which supports such) should be given such weight. That determination is for the ALJ to make. The ALJ's error is not that he failed to accord sufficient weight to Dr. Van Tol's opinion, but that he completely ignored the doctor's opinion and the evidence supporting such. In other words, the Court is not faulting the ALJ for wrongly weighing conflicting evidence, but rather the Court faults the ALJ for failing to weigh the evidence in the first place. For the reasons articulated above, therefore, the Court finds that the ALJ's decision is not supported by substantial evidence.

### b.    The ALJ Failed to Properly Evaluate Dr. Van Tol's Opinion

Even if the ALJ is deemed to have not ignored the evidence concerning Plaintiff's treatment at Origami, including that provided by Dr. Van Tol, the ALJ's decision must nonetheless be reversed. As detailed herein, Dr. Van Tol concluded that Plaintiff is unable to perform even a "simple" job on a consistent basis as a result of the brain injuries he suffered in the automobile accident. Dr. Van Tol, as one of Plaintiff's treating physicians, concluded that Plaintiff is impaired to an extent far greater than recognized by the ALJ. As detailed above, the opinions expressed by Dr. Van Tol are inconsistent with the ALJ's conclusion that Plaintiff was not disabled prior to the expiration of his insured status. While the ALJ obviously rejected Dr. Van Tol's opinion, he failed to articulate *any* rationale for doing so.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Accordingly, the medical opinions and diagnoses of treating physicians are given substantial deference, and if such opinions and diagnoses are uncontradicted, complete deference is appropriate. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Nonetheless, the ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

As the Sixth Circuit has made clear, however, when an ALJ chooses to accord less than controlling weight to the opinion of a treating physician, he must adequately articulate his rationale for doing so. *See Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544-47 (6th Cir. 2004). As the *Wilson* court held:

> If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors - namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source - in determining what weight to give the opinion.
>
> Importantly for this case, the regulation also contains a clear procedural requirement: "We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion." A Social Security Ruling

> explains that, pursuant to this provision, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Id.* at 544 (internal citations omitted).

As the *Wilson* court further held, failure to comply with this requirement is not subject to harmless error analysis. *Id.* at 546-47. As the court expressly stated:

> A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely. . .To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory.

*Id.* at 546 (internal citations omitted).

As previously noted, the ALJ failed to articulate any rationale for his decision to accord less than controlling weight to Dr. Van Tol's opinion. In light of the fact that the doctor's opinion is inconsistent with the ALJ's RFC determination, the ALJ's failure is not insignificant. The ALJ's failure in this regard clearly violates the principle articulated in *Wilson*.

c.     Evidence of Plaintiff's Disability is not Compelling

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of his disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling). While the ALJ's decision fails to comply with the relevant legal standard, there does not exist *compelling* evidence that Plaintiff is disabled. The record in this case contains conflicting medical evidence and opinions. This Court is neither authorized nor competent to resolve these conflicts in the first instance.

The Court recommends, therefore, that the Commissioner's decision be reversed and this matter remanded for further factual findings, including but not necessarily limited to, an assessment of Dr. Van Tol's opinion that as a result of his July 1996 automobile accident Plaintiff suffered a disabling brain injury and the impact that such has upon Plaintiff's RFC and the determination of whether there exist a significant number of jobs which Plaintiff can perform despite his limitations.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that the ALJ's decision is not supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: July 25, 2008

   /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge